PAUL ANTHONY MARTIN
Acting United States Attorney
District of Arizona
DAVID R. ZIPPS
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: david.zipps@usdoj.gov
Attorneys for Plaintiff

CR21-00793 TUC-SHR(BGM)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, <br><br> Plaintiff, <br><br> vs. <br><br> Frederick J. Stahmer <br><br> Defendant. | I N D I C T M E N T <br><br> Violations: <br><br> 18 U.S.C. § 1343 <br> (Wire Fraud) <br> Counts 1-4 <br><br> 18 U.S.C. §§ 981-82 <br> (Forfeiture) |

**THE GRAND JURY CHARGES:**                    VICTIM CASE

At all times material to the Indictment:

1.  Frederick J. Stahmer ("Stahmer") was a resident of Oro Valley, Arizona.

2.  Stahmer was the President and CEO of Frederick Entertainment, Inc., a concert and music promotion company located Oro Valley, Arizona, that to sought to finance, produce, market, and promote rock concerts in venues located around the United States.

**Background**

3.  Stahmer was a musician who had previously been in a band for many years. Prior to founding Frederick Entertainment, he had decided it was time for him to move from playing in concerts to producing them, which would allow him to bring music to fans in another capacity.

4. Stahmer and Frederick Entertainment produced their first concert in Las Vegas in 2011, which was a small show financed with the help of family. Very early on, however, Stahmer brought in small investors (investing in the range of $2500) to assist with financing. At that time, Stahmer had multiple arrangements with investors, from those investing on a "money in, money out" basis for a particular concert, to those investing for the long term because Stahmer was trying to build the business.

5. By 2013, Stahmer had had success building the business and was producing bigger shows. As a result, there was more opportunity to do shows with attendance from 2,000 to 4,000 people, as opposed to 500 to 1,000 people. At this time, Stahmer obtained new investors who were putting in anywhere from smaller amounts to $30,000 to $40,000.

6. One method Stahmer used to finance a concert was to sell "equity" in a particular show to his investors. In exchange for an investor's agreement to pay a percentage of the total costs for a concert (e.g., costs for the venue, band, and advertising), an investor would receive a corresponding percentage of the "equity" in the concert, which entitled the investor to receive that percentage of the profit generated by the show. Stahmer often prepared "pro formas" before concerts that contained projected costs and revenues for upcoming shows, and "profit and loss statements" after concerts containing the actual results for the shows, documents he used to solicit investors by explaining what they could expect to make if they invested.

7. In the three years from 2013 to 2016 after Stahmer's rock concert promotion business expanded, it did not have a net profit, and the business during that period was more losing money rather than making money.

### The Scheme

8. Beginning at a time unknown to the Grand Jury, but no earlier than in or about 2013, and continuing to September 2016, in the District of Arizona and elsewhere, defendant Fredrick J. Stahmer devised and intended to devise a scheme to defraud

investors in his rock concerts and rock concert promotion business, to obtain, hold, and apply money and property by means of materially false and fraudulent pretenses, representations and promises, and to conceal from his investors and vendors the true state of the financial health of his company and the use of their funds.

## Manner and Means

9.   Stahmer orchestrated his scheme through several means and methods, which included making misrepresentations about his business model and misrepresenting and concealing the results of his operations. Stahmer sold multiple investors equity interests in the concerts he was promoting, which were investments specific to a particular concert and which entitled the investor to repayment of the investment together with a share of the profit from the concert (known as a "dividend"). Despite taking this money based on the representation that it would be used for a specific show, Stahmer often used the investments he received for multiple other purposes, including paying off investors from prior shows and using the monies to pay expenses associated with concerts other than the ones for which the money was invested.

10.   Even though Stahmer's business was not making money in the period from 2013 to 2016, Stahmer claimed to existing and potential investors that both his business and his concerts were profitable. To this end, he generated multiple profit and loss statements that either overstated profits or understated losses to induce new investors to participate or to conceal from existing investors the true state of their investments. By doing so, Stahmer was able to obtain monies that he would not have otherwise received, and to avoid making disbursements of profits that he not actually made. Stahmer also encouraged existing investors to "roll over" their investments from one concert to another, a technique that allowed him to conceal his scheme by leading investors to believe that nonexistent profits they had made from a past concert would be invested in a future one, thereby concealing from investors that Stahmer did not have the profits he told investors they had made.

11. Stahmer also oversold or overissued the available equity in multiple concerts. As noted above, purchasing equity in a concert was a mechanism by which an investor covered a percentage of the costs of a concert in exchange for a corresponding share of the profits. Because investors could not receive more than 100% of the profits from a concert, the sale or issuance of equity to multiple investors that obligated Stahmer to pay more than 100% of the profits obligated him to pay out profits that he knew he could not make.

12. Stahmer also made false representations about when he would return investor money and the profits that investors would make or had allegedly made, thereby allowing him to obtain money he would not have otherwise have received and to conceal the fraud in which he was engaged. In at least one instance, Stahmer assured an investor that his $80,000 investment would remain 100% intact, after previously confirming that the money would only be tied up for six weeks with a 20-30% return. Stahmer also obtained a $35,000 loan from this individual by representing that the money would be repaid in a week. None of the monies were returned as promised, and after forwarding these monies to Stahmer, this individual did not hear from Stahmer again.

13. During the time period material to this Indictment, Stahmer caused losses to victims totaling more than $1 million.

**Wire Fraud**
**18 U.S.C. § 1343**
**(Counts 1-4)**

14. On or about each of the dates set forth below, in the District of Arizona and elsewhere, for the purpose of executing the scheme described above, defendant Frederick J. Stahmer caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

///

| Count | Date | Type of Transmission |
|---|---|---|
| 1 | May 4, 2016 | $25,000 wire transfer from Old Union Bank to the Chase Bank account of Frederick Entertainment, Inc. on behalf of Victim 1. |
| 2 | June 2, 2016 | $50,000 wire transfer from Old Union Bank to the Chase Bank account of Frederick Entertainment, Inc. on behalf of Victim 1. |
| 3 | August 24, 2016 | $80,000 wire transfer from Old Hickory Credit Union to the Wells Fargo bank account of Frederick Entertainment, Inc. on behalf of Victim 2. |
| 4 | September 9, 2016 | $35,000 wire transfer from Old Hickory Credit Union to the Wells Fargo bank account of Frederick Entertainment, Inc. on behalf of Victim 2. |

All in violation of Title 18, United States Code, Sections 1343.

## FORFEITURE ALLEGATION

Upon conviction of the offenses alleged in this Indictment, the defendant, Frederick J. Stahmer, shall forfeit to the United States of America, pursuant to:

1) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to offenses of Title 18, United States Code, Sections 1343 and 2; and

2) A sum of money equal to the amount of proceeds obtained as a result of the offenses.

If any of the property described above, as a result of any act or omission of the defendant: a) cannot be located upon the exercise of due diligence; b) has been transferred or sold to, or deposited with, a third party; c) has been placed beyond the jurisdiction of the court; d) has been substantially diminished in value; or e) has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property, including, but not limited to, all property, both real and personal, owned by the defendants.

All in violation of Title 18, United States Code, Sections 981(a)(1)(C); Title 28, United States Code, Section 2461(c); and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

/S/

FOREPERSON OF THE GRAND JURY
Dated: April 21, 2021

PAUL ANTHONY MARTIN
Acting United States Attorney
District of Arizona

/S/

DAVID R. ZIPPS
Assistant U.S. Attorney

**REDACTED FOR PUBLIC DISCLOSURE**