1  **WO**

2

3

4

5

6                   **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    United States of America,                    No. CR-21-00793-001-TUC-SHR (BGM)

10                  Plaintiff,                      **Order Accepting R&R Re: Defendant's Motion to Suppress Statements (Doc. 120)**

11   v.

12   Frederick John Stahmer,

13                  Defendant.

14

15        Pending before the Court is a Report and Recommendation ("R&R") (Doc. 120)

16   issued by United States Magistrate Judge Bruce G. Macdonald recommending the Court

17   deny Defendant's Motion to Suppress Statements (Doc. 64).  Defendant filed an Objection

18   (Doc. 125).  For the reasons below, the R&R is accepted over Defendant's Objection.

19        **I.      STANDARD OF REVIEW**

20        When reviewing a magistrate judge's R&R, this Court "may accept, reject, or

21   modify, in whole or in part, the findings or recommendations made by the magistrate

22   judge."  28 U.S.C. § 636(b)(1).  "[T]he district judge must review the magistrate judge's

23   findings and recommendations de novo *if objection is made*, but not otherwise."  *United*

24   *States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).  However, objections

25   to R&Rs "are not to be construed as a second opportunity to present the arguments already

26   considered by the Magistrate Judge."  *Betancourt v. Ace Ins. Co. of Puerto Rico*, 313 F.

27   Supp.2d 32, 34 (D.P.R. 2004); *see also Camardo v. Gen. Motors Hourly-Rate Emps.*

28   *Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) ("The purpose of the Federal

1  Magistrates Act is to relieve courts of unnecessary work" and "[t]here is no increase in

2  efficiency, and much extra work, when a party attempts to relitigate every argument which

3  it presented to the Magistrate Judge.").

4  ## II.   BACKGROUND

5  The Court adopts the following unobjected-to facts as set forth in the R&R:

6  Special Agent André H. Beauford ("SA Beauford" or "AB") of the Federal Bureau of Investigations ("FBI") began
7  the investigation of Defendant Frederick Stahmer ("Stahmer")
8  when he received a tip from an individual with a complaint regarding an investment scheme. (Doc. 118 at 10.)
9  In October 2016, the Government secured a search
10  warrant for the residence located in Oro Valley, AZ, more specifically described as: 1 E. Desert Sky Road Unit 12, Oro
11  Valley, Arizona (the "Premises"). (Doc. 118 at 10, 29, 60.) The Premises is a residential property in which all three family
12  members, Bruce, Evelyn, and Frederick Stahmer reside.
13  On the morning of October 26, 2016, immediately prior to executing the Search Warrant, FBI agents in cooperation
14  with agents of the Oro Valley Police Department ("OVPD"), held an operational briefing near the Premises at 7:00 a.m.
15  (Doc. 118 at 26, 28.) The purpose of the Operational Briefing was to coordinate the two departments and review the
16  Operation Plan designed to execute the Search Warrant. (Doc. 118 at 29-31, 68.)
17  At approximately 7:46 a.m. on October 26, 2016, agents
18  arrived at the Premises and executed the Search Warrant. (Doc. 118 at 13, 28.) In addition to the surveillance team,
19  approximately fourteen law enforcement arrived on the Premises to execute the Search Warrant, two agents from the
20  FBI were unarmed, and the twelve remaining agents were armed. (Doc. 118 at 11, 13, 27-28.) The team performed the
21  customary procedures for execution of search warrant to
22  include, but not necessarily limited to the following: 1) approach the door and knock with the hope that the individuals
23  inside would come to the door; 2) secure the individuals that are in the house, outside, and make sure they are safe; 3) take
24  entry photographs; and 4) when a target is present, depending, attempt to interview – reach out if they would like to be
25  interviewed while search is conducted. (Doc. 118 at 12-14.)
26  When agents knocked at the front door, SA Beauford,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FBI, heard a commotion from the garage door opening, and Detective Zachary Young (Det. Young), OVPD, saw an individual coming out of the garage with something in his hand. (Doc. 118 at 14, 37-38, 61-62, 66.) Det. Young unholstered his firearm, and the individual complied with putting down the object in his hand. (Doc. 118 at 62, 67.) Upon further investigation, Det. Young determined that the gentleman in the garage was Stahmer's father, Bruce Stahmer. (Doc. 118 at 61.) Five officers were part of the entry team that performed a protective sweep to clear and secure the Premises. (Doc. 118 at 13, 15.) Clearing the residence customarily includes weapons up to make sure there are no threats in the house. (Doc. 118 at 13-16.) Present at the home were Stahmer, Stahmer's parents, and Stahmers' dog, and cat. Agents directed Stahmer and Stahmer's parents to the driveway of the Premises, with Stahmer's dog, and Stahmer's cat was secured in one of the bedrooms. (Doc. 118 at 78, Doc. 98-1 at 46.) Agents arrived at the Premises at approximately 7:46 a.m. began searching at approximately 8:20 a.m. (Doc. 118 at 13.) The agents, upon entry, and at the conclusion of the search, took photographs to show the condition of the Premises. (Doc. 118 at 13.)

After the Premises was cleared, Stahmer agreed to speak with two agents, SA Beauford, FBI, and Detective M. Carr ("Det. Carr" or "MC"), OVPD. (Doc. 118 at 16-17.) Without hand cuffs or restraints—SA Beauford and Det. Carr escorted Stahmer from the driveway through the garage to the den and then to the porch. (Doc. 118 at 88-90.) The exterior doors to the house, and the gate from the patio to the pool area, were closed. (Doc. 118 at 92, 100.) Seated at a table on the patio of the Premises, for the interview and questioning, were SA Beauford, FBI, Det. Carr, and Stahmer. (Doc. 118 at 91-92, Exh. 34.) The two agents wore "more plainclothes" a "uniform of sorts," not a full uniform. (Doc. 118 at 92.)

Prior to the questioning, SA Beauford, in the presence of Det. Carr, informed Stahmer that he was not under arrest, that the nature of the interview was voluntary, that if he didn't want to talk at any point in time, he could just let them know, and he could get up and go. (Doc. 118 at 94, 104.) Without giving him any Miranda warnings, and without handcuffs, restraints, or threats, the agents interviewed Stahmer. (Doc. 118 at 98, 110-11.)

The interview began at 8:16 a.m. and ended at 10:16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a.m., lasting approximately two hours. (Doc. 118 at 18; Doc. 98-1 at 3, 137.) The tone of the interview was cordial and free from threats, restraints, and or promises. (Doc. 118 at 52, 94, 103-04, 110-11; Doc. 98-1 at 18; Exh. 7.) About halfway through the interview, the questioning ceased temporarily to allow Stahmer to take his heart medications with food and water. (Doc. 118 at 87, 111; Doc. 98-1 at 46-48.) During this short break, Stahmer's Mother, Evelyn Stahmer, Stahmer's dog, Maggie or "Mag," and Agent Stacey Gutierrez joined Stahmer, SA Beauford, and Det. Carr on the patio. (Doc. 118 at 111-12; Doc. 98-1 at 56-58.) The interview of Stahmer was recorded, the recording transcribed ("Transcription") (Doc. 98-1), and the transcript was formally admitted into evidence at the hearing. See ME 05/11/23 (Doc. 102).

Defendant's business, Frederick Entertainment, Inc., is a concert and music promotion production company for organizing live events with musicians and bands at various venues. (Doc. 98-1 at 8-19.) The live events are funded by investors solicited by Stahmer to finance the events with options for short term return, i.e., to invest in one event and receive back principle and potential dividends; and or long-term investments, i.e., investors may choose to "roll" their investment from one event into the next event and receive back principle and potential dividends. (Doc. 98-1 at 18-19.) The terms of each agreement between Stahmer and each investor, varied, and subject to change. (Doc. 98-1 at 14-16.) Stahmer's agreements with investors were sometimes based on written contracts while other agreements relied on a "handshake." (Doc. 98-1 at 14-15.) The written contracts were sometimes signed in-person and sometimes signed electronically and via email. (Doc. 98-1 at 51-52.) Stahmer received investor's funds by wire transfer and or check. (Doc. 98-1 at 42.) To solicit investors, Stahmer sometimes told investors that his company made money, or was profitable, when the company may, or may not, in fact, be profitable at that time. (Doc. 98-1 at 20-21.) Stahmer did not use Quickbooks for his company's accounting purposes. (Doc. 98-1 at 21.) Stahmer used Excel spreadsheets or Google Sheets (online spreadsheets in real-time from any device) and his banks to track the financing. (Doc. 98-1 at 22.) Sometimes, Stahmer would generate pro formas for projections prior to the live events, and or P and L statements after the live events, that would show how much each event made. (Doc. 118 at 109-10; Doc. 98-1 at 23-24.)

1

2

3

4

5

6

7

8

. . .

   On April 21, 2021, Stahmer was indicted on four counts of Wire Fraud under 18 U.S.C. § 1343, and forfeiture under 18 U.S.C. § 981-82, in pertinent part, "for having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," and for causing "to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writing, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[.]" (Doc. 1.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(Doc. 120 at 2–6.)

   In March 2023, Defendant filed a motion to suppress his statements arguing law enforcement officers had violated his constitutional rights under the Fifth and Sixth Amendments. (Doc. 64 at 4.) Defendant argued he was in custody and law enforcement officers should have read him his *Miranda* warnings prior to interrogating him because they created a "police dominated atmosphere" in his home before and during interrogation. (*Id.*) Specifically, Defendant argued the analysis in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), applied to this case and the four factors showed Defendant was in custody in this case when he was being interrogated. (Doc. 64 at 4–12.) Defendant also argued the facts surrounding his interrogation made all his statements involuntary. (*Id.* at 12–14.) Specifically, he argued his statements were involuntary because: the officers loudly pounded the door at the front of the house, an officer pointed a pistol at him, an officer initially asked him to stand in the driveway away from his parents, an officer prevented him from talking to his attorney neighbor, and he was not allowed to go to the bathroom, drink water, or take medications until 38 minutes into the interview. (*Id.* at 13–14.)

   After an evidentiary hearing on the motions, (Docs. 102, 109) Judge Macdonald issued his R&R recommending the Court deny Defendant's Motion to Suppress Statements because, based on the totality of the circumstances, Defendant was not in custody and his statements were not involuntary.[1] (Doc. 120 at 24.) Specifically, Judge Macdonald

---

[1]Judge Macdonald also found Defendant had not been unreasonably seized for

1    analyzed the four *Craighead* factors and found the first factor weighed in favor of

2    Defendant and the other three weighed in favor of the government.  (*Id.* at 15–22.)  Judge

3    Macdonald also found the following facts persuasive: Defendant's testimony regarding a

4    news article where Defendant admitted to cooperating with law enforcement; lack of

5    physical restraint during the interrogation; lack of an officer blocking the door to the inside

6    of the house; and lack of arrest on the day of the interrogation.  (*Id.* at 22–24.)

7         Defendant filed an Objection arguing Judge Macdonald erroneously failed to

8    suppress his statements to law enforcement officers because he was not read his *Miranda*

9    rights before interrogation despite a "police dominated atmosphere."  (Doc. 125 at 2.)

10   Specifically, Defendant argues Judge Macdonald ignored and misapplied the following

11   facts in his *Miranda* analysis:  "Officers loudly knocked on the front door, pointed guns at

12   Mr. Stahmer, searched him, ordered him to stand outside the home and away from his

13   mother and father by the driveway, did not allow him to use the bathroom nor take his

14   medications after waking up, and prevented him from speaking with an attorney neighbor

15   who lived two houses west while he stood waiting outside."  (*Id.*)

16        According to Defendant, the second *Craighead* factor weighs in his favor because

17   he was restrained by Agent Beauford's statement that he could only "sit somewhere secure"

18   and he was restrained by the police-dominated atmosphere in his home (i.e. police cars

19   parked outside and guns pointed at him).  (*Id.* at 4.)  He also claims the third *Craighead*

20   factor weighs in his favor because law enforcement isolated him by: allowing his mom to

21   talk to him for only 30 seconds during the interrogation, failing to ask him or his parents

22   whether they wanted to sit together during the interview, separating him from his parents

23   for 45 minutes before the interrogation started, and escorting him, by himself, from the

24   driveway to the patio for the interrogation.  (*Id.* at 5.)  Lastly, he claims the fourth

25   *Craighead* factor weighs in his favor because Agent Beauford qualified his statement that

26   _____

27   Fourth Amendment purposes when he was detained during the execution of the search
     warrant.  (Doc. 120 at 13–14, 16.)  Specifically, he found law enforcement conducted a
28   reasonable seizure when they asked Defendant to not leave the home or patio during
     execution of the search warrant.  (*Id.*)  Because Defendant does not object to this analysis,
     (Doc. 125 at 3, 6) the Court will not address it. *See Reyna-Tapia*, 328 F.3d at 112.

1    Defendant could "get up and go" by instructing Defendant he could only "sit somewhere

2    secure" on the premises.  (*Id.* at 5–6.)

3         The Government filed a Response arguing Judge Macdonald correctly concluded

4    no *Miranda* warnings were necessary because Defendant was not formally arrested and,

5    based on the totality of the circumstances, "there was no restraint on the defendant's

6    freedom of movement of the degree associated with a formal arrest."  (Doc. 133 at 1–2.)

7    According to the Government, Judge Macdonald did not "ignore these facts [raised by

8    Defendant], he simply did not credit them."  (*Id.* at 3.)  The Government also argues "the

9    statements were plainly voluntary."  (*Id.* at 6.)

10   **III.    LEGAL STANDARD**

11        The Government is precluded from using statements arising from custodial

12   interrogation absent the provision of warnings outlining the person's rights.  *Miranda v.*

13   *Arizona*, 384 U.S. 436, 444 (1966).  To determine whether a person was in custody, "the

14   ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of

15   movement' of the degree associated with a formal arrest."  *Stansbury v. California*, 511

16   U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  The

17   Court must look at the totality of circumstances and decide whether a reasonable person

18   would "have felt he or she was not at liberty to terminate the interrogation and leave."

19   *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

20        Traditionally, "courts have . . . been much less likely to find that an interrogation in

21   the suspect's home was custodial in nature," because "[t]he element of compulsion that

22   concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar

23   surroundings."  *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008).  In certain

24   scenarios, however, where the familiarity of the home is converted into a police-dominated

25   environment, a reasonable person "may not feel that he can successfully terminate the

26   interrogation if he knows that he cannot empty his home of his interrogators until they have

27   completed their search."  *Id.*  The Ninth Circuit has highlighted several non-exhaustive

28

1   factors to consider when conducting a fact-intensive inquiry into whether an interview

2   conducted within the home was custodial:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

8   *Id.* at 1084.

9   Moreover, there cannot be a finding of involuntariness under the Due Process clause

10   in the absence of police coercion. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). When

11   a confession is challenged, the government must establish voluntariness by a

12   preponderance of the evidence. *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir.

13   2004). "In determining the voluntariness of a confession, a court 'examines whether a

14   defendant's will was overborne by the circumstances surrounding the giving of a

15   confession.'" *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (quoting *Dickerson v.

16   United States*, 530 U.S. 428, 434 (2000)). The Court must consider the totality of the

17   circumstances, including "the characteristics of the accused and the details of the

18   interrogation." *Id.*

19   **IV.   ANALYSIS**

20   ***A. Whether Defendant's Interview was Custodial***

21   The Court will address each of the factors identified above.

22   1.  <u>The number of law enforcement personnel and whether they were armed</u>

23   Based on Agent Beauford's testimony, approximately fourteen law enforcement

24   officers participated in the execution of the search warrant in this case. (Doc. 118 at 11.)

25   Twelve of the fourteen officers were armed. (*Id.*) "[T]he presence of a large number of

26   visibly armed law enforcement officers goes a long way towards making the suspect's

27   home a police-dominated atmosphere." *Craighead*, 539 F.3d at 1085. The Court finds this

28   factor weighs in favor of Defendant.

1

        2.  Whether the suspect was at any point restrained, either by physical force or by

2

           threats

3        Defendant was not physically restrained or handcuffed during his interview with

4  law enforcement. (Doc 118 at 110.) Unlike *Craighead*, Defendant was not enclosed in a

5  room where the only exit was blocked by an armed law enforcement officer; the interview

6  took place at a table on the outside patio of the house being searched and there was no

7  officer blocking any door. (*Id.* at 16–17; 42, 46, 48.) Even if Defendant could not leave

8  his house as he contends, he was free to stop the interview and he seemingly could have

9  opened the unguarded gate to the backyard area if it was closed. (Doc. 118 at 92.) As

10  Defendant admitted at the hearing, the tone of the interview was cordial and he was not

11  verbally threatened. (*Id.* at 94, 111.) The two law enforcement officers interviewing him

12  were also in plain clothes. (*Id.* at 92.)

13        Defendant testified two officers pointed a gun at him shortly after officers first

14  entered the premises to execute the search warrant (*Id.* at 81, 110); however, this testimony

15  was not corroborated by the agent who testified at the hearing. (*Id.* at 40–41.) Defendant

16  seemingly argues he felt threatened and intimidated by this behavior. (*Id.* at 81, 110; Doc.

17  125 at 4.) However, Defendant's interview did not start until approximately 45 minutes

18  after this alleged encounter occurred and, even if it did occur, it appears to be a brief,

19  limited encounter done for purposes of officer safety. (Doc. 118 at 15, 81.) Defendant

20  does not argue any weapons were pointed at him at any other time during the search or

21  interrogation. To the extent Defendant argues law enforcement asked him about two

22  previous unrelated indecent exposure incidents to intimidate him, the Court finds this

23  carries little weight, if any, because it occurred near the end of the interview. (*Id.* at 51–

24  52; Doc. 98-1 at 110–19.) Therefore, the Court finds this factor weighs in favor of the

25  Government.

26        3.  Whether the suspect was isolated from others

27        Defendant was questioned for nearly two hours by Agent Beauford and Detective

28  Carr in the outdoor patio area. (Doc. 98-1 at 3.) During this time, he was separated from

- 9 -

1     his parents but there is no evidence in the record that Defendant requested to have his

2     parents present during the interview or that his parents were denied from being present for

3     the interview.  In fact, Agent Beauford testified he was not attempting to isolate Defendant

4     from his parents by escorting him to the porch, and his parents would have been allowed

5     to sit in on the interview if they had asked to join.  (Doc. 118 at 17–18.)  About halfway

6     through the interview, an agent escorted Defendant's mother onto the patio to give

7     Defendant food, water, and his medications.  (Doc. 98-1 at 44–48, 56–57.)  Defendant also

8     seemingly argues the Court should consider that he was separated from his parents on the

9     driveway before his interview began.  (Doc. 125 at 5.)  The Court finds this fact carries

10     little, if any, weight because it occurred approximately 45 minutes before any relevant

11     questioning.  The Court finds this factor weighs in favor of the Government.

12                4.   <u>Whether the suspect was informed that he was free to leave or terminate the</u>

13                    <u>interview, and the context in which any such statements were made</u>

14           At the beginning of the interview, Agent Beauford told Defendant he "is not under

15     arrest" and explained they just wanted to have a conversation with him.  (Doc. 98-1 at 3.)

16     He told Defendant "[I]f you don't wanna talk to us at any point in time, you can just let us

17     know.  You can get up and go.  That's—well, can't go in the house, obviously, but you can

18     sit somewhere secure.  So, um, obviously all of this is volunteered.  We just kind wanna

19     have a conversation with you." (*Id.*)  At the hearing, Defendant admitted he was told at

20     the beginning of the interview that he was not under arrest and that he was free to go if he

21     wanted to.  (Doc. 118 at 104.)  Nonetheless, Defendant agreed to talk to them.  While there

22     were two agencies involved here, representatives of both were present when Defendant

23     was told he not under arrest and could get up and go.  Therefore, Agent Beauford spoke

24     for both.  The Court finds this factor weighs in favor of the Government.

25           Based on the totality of the circumstances, the Court concludes Defendant was not

26     in custody during his interview and, therefore *Miranda* warnings were not necessary.

27          **B.  <u>Voluntariness</u>**

28           Based on the totality of the circumstances, the Court cannot conclude Defendant's

1  will was overborne during the interview.  Nothing in the record indicates threats or

2  promises were made in return for an admission of guilt.  Defendant generally appeared to

3  be cooperative, provided direct answers to the questions, and seemed engaged throughout

4  the interview.  The interview was cordial and even stopped so Defendant could take his

5  medications.  Therefore, the Court finds by a preponderance of the evidence Defendant's

6  statements were voluntarily given.

7      Accordingly,

8      **IT IS ORDERED** Magistrate Judge Bruce G. Macdonald's Report and

9  Recommendation (Doc. 120) is **ACCEPTED** in its entirety.

10     **IT IS FURTHER ORDERED** Defendant's Motion to Suppress Statements (Doc.

11  64) is **DENIED**.

12     Dated this 11th day of July, 2023.

13

14

15

16                Honorable Scott H. Rash
                  United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28